[Civ. No. 13496.   Second Dist., Div. One.   June 10, 1942.]

HELEN S. OTIS et al., Appellants, v. CITY OF LOS ANGELES (a Municipal Corporation) et al., Respondents.

Arthur W. Kennedy and Saul S. Klein for Appellants.

Ray L. Chesebro, City Attorney, and Frederick von Schrader, Assistant City Attorney, for Respondents.

WHITE, J.—This action was instituted by plaintiffs for declaratory relief in connection with the enforcement of certain provisions of a zoning ordinance of defendant city as it related to property owned by plaintiffs in said city.

Plaintiffs, who are mother and daughter, own certain real property at the southeast corner of Whitley Terrace and Cahuenga Boulevard in the city of Los Angeles, upon which they maintained their home for more than thirty years. Before the acquisition of this property by plaintiffs and the erection of their home thereon, Cahuenga Boulevard was a narrow, dusty road, used considerably by farmers bringing their produce to the city. Whitley Terrace was a narrow street of adobe houses, ruts, and no traffic. About the year 1914 Cahuenga Boulevard was improved with oil and gravel, and as the years went by traffic increased because the pass

had been slightly improved in grade. With the growth of population and activity in Los Angeles through the years the traffic increased to a great extent. The erection of Hollywood Bowl, with a seating capacity of about thirty thousand people, and the Pilgrimage Play Amphitheater about two blocks from plaintiffs' property, created an increasingly heavy traffic condition. About the year 1927 the citizens in the Hollywood district proposed what is commonly known as the ''Five-Fingered Traffic Plan'' for the district. This plan involved five separate traffic lanes converging in the vicinity of plaintiffs' property similarly to the fingers on the hand. In connection with the ''Five-Fingered Traffic Plan'' an underpass of concrete was built to take the flow of automobile traffic from the north going east on Cahuenga Boulevard. This underpass is several hundred feet from plaintiffs' property and was completed for use about a year prior to the commencement of this litigation. The completion of this plan and the use of the underpass materially increased the traffic. There is testimony in the record that the noise, fumes and constant roar of automobiles using the underpass make plaintiffs' property unsuitable for residential income or for use as a residence. There is also uncontradicted testimony that sixty per cent of the property in the district is now vacant. The taxes on plaintiffs' property amount to approximately $750 per year. Due to the changed conditions in the district by reason of traffic improvements, there are no parking facilities and practically no foot traffic in the neighborhood. It is conceded that Cahuenga Boulevard constitutes one of the main traffic arteries from the Hollywood and Los Angeles districts to the San Fernando Valley area of the city, and as such carries considerable amount of vehicular traffic. In fact, it appears that a traffic count for Cahuenga Boulevard, taken in January, 1938, showed that approximately 32,000 cars passed plaintiffs' property in a twenty-four-hour period, and that from a standpoint of traffic capacity this boulevard is one of the most heavily traveled thoroughfares within the municipality. The report of defendant city's zoning engineer, as it appears in the pleadings, states: ''It is only natural that this heavy traffic flow would have a tendency to detract from the desirability of the abutting property for residence purposes. By the same token, however, this heavy traffic is such as to interfere with the conduct of the ordinary types

of business uses which might be established along the street frontage.''

There are in effect in the city of Los Angeles certain zoning ordinances (Los Angeles Municipal Code [Ord. No. 77,000], ch. 1, art. 2, as amended), providing for ten classes or districts, known as zone R-1, etc., and including zone R-4, in which last mentioned zone a large part of the property fronting on Cahuenga Boulevard, including that belonging to plaintiffs, was placed. The ordinance with which we are here concerned restricts the use of property in zone R-4 to residence buildings and provides that no buildings or improvements other than such residence building shall be erected or made therein, and a penalty is provided for violation thereof. Section 15.12 of the ordinance also provides:

''Where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of this article, the Board'' (board of city planning commissioners) ''upon its own motion, or upon verified petition of any property owner filed with the Board, stating fully the grounds of the petition and all facts relied upon by the petitioner, shall have the power to grant upon such terms and conditions as the Board may deem proper, variances from the rules, regulations or provisions contained therein, in harmony with their general purpose and intent and so that the spirit of the Article shall be observed, public safety and welfare secured and substantial justice done. Every such action or decision of the Board authorizing a variation of the application of the regulation herein established must be by resolution of the Board setting forth the written finding of facts required by the following subsection, and must be duly entered in the minutes of the Board.

''(b) In order to justify a variance under the provisions of this section, the three following qualifications must be shown relative to the property or particular use involved in the application for such variance; and the Board's resolution of approval in connection with any such applications must contain a written finding of facts showing wherein the property or particular use involved meets the three following qualifications:

''(1) That there are exceptional or extraordinary circumstances or conditions applicable to the property or buildings involved or the intended use thereof that do not apply generally to the property or class of buildings and uses in the

same district or zone and which produce practical difficulties or unnecessary hardships in the way of adhering to the strict letter of this Article.

"(2) That such variance is necessary for the preservation and enjoyment of a substantial property right of the petitioner such as that enjoyed by adjacent owners in the same district and zone; and

"(3) That the granting of such variance will not be materially detrimental to the public welfare or injurious to the property or improvements in the zone or district in which the property is located. . . ."

In conformity with the section of the ordinance just mentioned, plaintiffs filed their application for a zone variance from R-4 use which would permit the erection of a building on part of their property consisting of 94 feet frontage on Cahuenga Boulevard by 80 feet in depth, for the purpose of conducting therein a super-service gasoline station and the business incidental thereto. In their petition to the board plaintiffs alleged that the conduct of said business would in no way interfere with the traffic for the reason that all cars entering into said proposed station would enter from the west-flowing traffic, making a right hand turn into the station and a right hand turn out of the station, flowing into east and south bound traffic; that the use of said property for a gasoline service station would not be detrimental to the public welfare or inimical to other property or improvements in the same zone; that the district in which said property is located has materially changed, and if plaintiffs are not permitted to use the property for other than residence purposes they will be deprived of a substantial property right. Plaintiffs' petition was denied by the board, and thereafter an appeal was taken to the council of the city of Los Angeles, as provided by the ordinance, and the last named tribunal denied such appeal. Thereafter plaintiffs presented their proposed plans and specifications to the defendant department of building and safety, making application for a permit to erect a structure to permit plaintiffs to use their property for business purposes, to wit, a gasoline service station, and this permit was refused. Thereupon this action was filed by plaintiffs. Following trial before the court sitting without a jury, judgment was rendered in favor of defendants. From such judgment and the order denying their motion for a new trial plaintiffs prosecute this appeal.

The trial court found, among other things, that "the establishment, maintenance or operation of a gasoline service station on plaintiffs' real property would seriously interfere with the travel and traffic upon Cahuenga Boulevard and would create a potential traffic hazard thereon." It was further found that plaintiffs' property is improved with a single family residence, which is being used and occupied for that purpose; that such real property is reasonably usable and useful for residence purposes. The court further found: "That plaintiffs' property would be enhanced in value if permitted to be used for the purpose of establishing, maintaining and conducting a gasoline service station thereon, but that plaintiffs are not, and neither of them is, deprived of any property right, and that the establishment, maintenance or conduct of a gasoline service station upon plaintiffs' real property would be materially detrimental and injurious to other property and improvements in the district in which same is situated."

At the trial it was proved that "variances" had been granted as to certain other property adjacent to and in the vicinity of that belonging to plaintiffs. For instance, such variance was granted by defendant city as to the second lot east of the property here in question which permitted the operation and maintenance of a flower stand thereon. Another variance was granted on property between Fairfield and Highland Avenues on the south side of Cahuenga Boulevard; also upon property on the east side of Highland Avenue. These variances, as well as those granted in connection with four other pieces of property zoned as was plaintiffs' property, permitted the use of such property for commercial purposes.

At the trial plaintiffs introduced evidence that their property was suitable for a gasoline station; that it would not create a traffic hazard were it so used; that their property is not salable under the present zoning conditions; that sixty per cent of the property in the district is vacant because of its unsuitability for residence purposes. Testimony was given by two witnesses engaged for many years in the real estate business to the effect that plaintiffs' property is not suitable for residence purposes nor for income residence purposes. Defendant city introduced two expert witnesses, one of whom, after qualifying as a realtor and appraiser, stated that in his opinion the use of plaintiffs' property as a gasoline station

would be very detrimental to the property and homes in the district and particularly to the residence property adjoining. This witness resides about four hundred feet from the property here in question. Another witness, L. F. Brinkman, zoning manager for the department of city planning of Los Angeles, in which capacity he had been employed for seventeen years, stated that he made a survey of the district in which plaintiffs' property is situate, and that in his opinion the establishment and maintenance of a gasoline service station would be detrimental to the adjoining property and improvements; that it would be hazardous to traffic on Cahuenga Boulevard for the reason that it is in close proximity to the south exit of Hollywood Speedway. In a further statement of his reasons for the opinion given by him that the use of plaintiffs' property as a gasoline station would be detrimental to the properties in the neighborhood, this witness testified, "Because this property is part of a large residential district which is located southerly and westerly of Cahuenga Boulevard, and up to the present time, other than the business uses already established at the intersection of Highland and Cahuenga, there have been no other business encroachments in that area, until you get further south on Cahuenga Boulevard, where there is a business zone."

We shall first give consideration to respondents' claim that actions such as this, for declaratory relief, cannot be maintained against municipal corporations. It is true that in the cases of *Bayshore Sanitary District* v. *San Mateo County,* 48 Cal. App. (2d) 337 [119 P. (2d) 752], and *Irvine* v. *Sacramento etc. Drainage District,* 49 Cal. App. (2d) 707 [122 P. (2d) 320], it was held that section 1060 of the Code of Civil Procedure, relating to actions for declaratory relief, does not authorize the bringing of such an action against the state or its political subdivisions; but respondents' contention that the legal status of a municipal corporation is akin to that of a county cannot be sustained either upon reason or authority. As was tersely stated in *County of San Mateo* v. *Coburn,* 130 Cal. 631, 636 [63 Pac. 78, 621], "A county is a governmental agency or political subdivision of the state, organized for purposes of exercising some functions of the state government, whereas a municipal corporation is an incorporation of the inhabitants of a specified region for purposes of local government." And again, section 1 of article XI of our state Constitution provides, "The several counties,

as they now exist, are hereby recognized as legal subdivisions of this state.'' It is the free consent of the persons composing them that brings into existence municipal corporations, and they are used for the promotion of their own local and private advantage and convenience, while it is the sovereign will which brings into being counties as local subdivisions of the state; and the establishment of such political subdivisions of the state is accomplished without the solicitation, consent or concurrent action of the people residing within them. Cities, therefore, are distinct individual entities, and are not connected political subdivisions of the state. As a matter of fact, municipalities, and particularly charter cities, are in a sense independent political organizations and do not pretend to exercise any functions of the state. They exist in the main for the purposes of local government. Subject only to the restriction that no suit shall be brought on any claim for money or damages against the city of Los Angeles until a demand for the same has been presented, the charter of said city provides for the right and power of the municipality to sue and be sued. The action with which we are here concerned cannot be classed as a claim for money or damages against the city, and by reason of what we have herein said we are persuaded that the municipality enjoys no dispensation from being sued under section 1060 of the Code of Civil Procedure in an action for declaratory relief.

In considering the instant case, we may assume that the zoning ordinance in question is valid, generally speaking, so far as its intended purposes are concerned, and the question presented to us is whether the application of the ordinance to appellants' property is unreasonable, arbitrary and discriminatory. In *Hagenburger* v. *City of Los Angeles,* 51 Cal. App. (2d) 161, 163 [124 P. (2d) 345], the court, speaking through Mr. Presiding Justice Nourse, said, ''When a zoning ordinance of this type is under attack it is not necessary for the court to consider the validity of the ordinance as a whole, but it may direct the attack to the reasonableness of the enforcement of the ordinance against the particular property involved.''

The trial court based its findings and conclusion that the enforcement of this ordinance against appellants' property was not unreasonable, upon evidence that the establishment, maintenance, conduct and operation of a gasoline station upon such property would seriously interfere with the traffic

and travel upon Cahuenga Boulevard and would create a potential traffic hazard thereon; that appellants' property is improved with a single family residence; is being used and occupied for that purpose, and is reasonably usable and useful for such purpose. Further, that while the establishment and operation of a gasoline station upon appellants' property would enhance the value thereof, such use of the property would prove in a material way detrimental and injurious to other property and improvements in the district where it is situated.

Even though we concede that the zoning of appellants' property for residence purposes only depreciated its value, that fact is not of controlling significance. As was said in *Zahn* v. *Board of Public Works*, 195 Cal. 497 [234 Pac. 388], "Every exercise of the police power is apt to affect adversely the property interest of somebody." It was not a denial of plaintiffs' constitutional right to the equal protection of the laws for the city of Los Angeles to discriminate against plaintiffs by granting variances to some property owners and refusing a variance grant to plaintiffs in the same district. The zoning ordinance here in question, like most such ordinances, contains provisions under which an owner may apply to an administrative board for permission to put his land to a non-conforming use. Such procedure has been devised and approved as a means of minimizing the admitted evils of "spot zoning" by amendment of the ordinance. When special conditions arise which give force to the claim that unnecessary hardship would ensue from a literal enforcement of the restrictive features of the ordinance, relief is afforded by the granting of a variance. ▪▪▪ But the granting or refusal of such variance rests largely in the discretion of the administrative body charged with enforcement of the ordinance. Where, as in the instant case, the ordinance authorizes the board to grant a variance "upon such terms and conditions as the board may deem proper," a refusal to grant such a variance will not be disturbed by the courts in the absence of a clear and convincing showing of an abuse of the discretion vested in such board. (*Rubin* v. *Board of Directors*, 16 Cal. (2d) 119, 124 [104 P. (2d) 1041].) Where, as in the case at bar, the evidence is in conflict, thereby indicating that reasonable minds not only might, but in fact do, disagree as to the wisdom and propriety of denying the variance sought by plaintiffs, the determination of the administrative board

is conclusive. As was said in this regard by our Supreme Court in *Acker* v. *Baldwin,* 18 Cal. (2d) 341 [115 P. (2d) 455]:

"It is now settled beyond question that although a court may differ from the determination of the legislative body, unless a zoning measure is clearly oppressive, it will be deemed to be within the purview of the police power. There will always be difference of opinion as to the means of accomplishing a particular end, but if there is a reasonable basis for the belief that the establishment of a strictly residential district has substantial relation to the public health, safety, morals or general welfare, a zoning ordinance to accomplish that purpose will be upheld. (*Miller* v. *Board of Public Works,* 195 Cal. 477 [234 Pac. 381, 38 A. L. R. 1479]; *Zahn* v. *Board of Public Works,* 195 Cal. 497 [234 Pac. 388].) .... Moreover, it is not necessary, in order to sustain such legislation, to show that the public welfare demands the exclusion of business uses for each individual lot in the area zoned. (*Rehfeld* v. *San Francisco,* 218 Cal. 83 [21 P. (2d) 419]; *Jones* v. *City of Los Angeles,* 211 Cal. 304 [295 Pac. 14], at 309.)"

Appellants finally assert that it constituted an unreasonable and unwarranted exercise of the police power of the city to refuse to grant them a variance so that they could make the highest and best use of their property. This contention cannot be upheld. The adaptability and suitability of appellants' property for business purposes is not controlling —the best interest of the entire district is the controlling factor. The mere fact that damage resulted to plaintiffs' property from the application of the ordinance thereto in no way affects the validity of the legislative or administrative board's action. When the exercise of the police power is proper and reasonable, ensuing damage to one's property is one of the prices the individual must pay as a member of society, to the end that the general welfare of the community may be served. (*Reynolds* v. *Barrett,* 12 Cal. (2d) 244, 250 [83 P. (2d) 29].)

The findings of the trial court, while based on conflicting evidence, are nevertheless supported by substantial evidence to justify the conclusions arrived at. Unless the application of a zoning ordinance is clearly oppressive, it will be deemed to be a proper exercise of the police power; and this is true even though a court may differ from the determination of the zoning authorities. Just as in the instant case, there will always be a difference of opinion as to the proper means of

accomplishing a particular end; but if there be a reasonable basis for the belief that the restriction of the use of the property to residence purposes has a substantial relation to the public health, safety, morals or welfare, the zoning ordinance, or its administration, to accomplish that purpose must be upheld. Nor is it necessary as a basis for sustaining such legislation or the enforcement thereof to show that the public welfare demands the exclusion of business uses as to each individual lot in the area zoned. (*Rehfeld* v. *San Francisco,* 218 Cal. 83 [21 P. (2d) 419]; *Jones* v. *City of Los Angeles,* 211 Cal. 304, 309 [295 Pac. 14].)

The attempted appeal from the order denying plaintiffs' motion for a new trial is dismissed, and for the reasons herein stated the judgment is affirmed.

York, P. J., and Doran, J., concurred.