[Civ. No. 18456. Second Dist., Div. Two. June 12, 1951.]

GEORGE BRADBEER et al., Appellants, v. GEORGE ENGLAND et al., Respondents; SAMUEL FIRKS, as Trustee, etc., et al., Interveners.

A. J. O'Connor and George J. Hider for Appellants.

Clyde Woodworth and Dunlap, Holmes, Ross & Woodson for Respondents.

Spencer & Harris for Interveners.

MOORE, P. J.—The Hollywood Turf Club, herein referred to as Turf Club, as owner of 124 acres within the city of Inglewood filed with the city's planning commission, herein designated commission, an application for zone variance with respect to a portion of its property from R-1, one-family zone, to R-3, multiple-family zone, by virtue of provisions of section 14 of ordinance 925 as amended by ordinance 947. Its application was duly denied by the commission which found the prerequisites of section 14 to be not supported, and that the granting of such variance would be materially detrimental to the public welfare. Turf Club thereupon appealed from the decision of the commission to the city council which was composed of respondents who after a public hearing overruled the commission and granted the variance. After a reconsideration of their decision, respondents decided to adopt resolution No. 3150 granting the Turf Club the variance requested. Thereafter, appellants as residents, electors and taxpayers of Inglewood filed their petition in the superior court for a writ of certiorari demanding an annulment of resolution No. 3150. After respondents filed their answer, one Samuel Firks as trustee of Hollypark Knolls, Inc., filed his complaint in intervention declaring that corporation to be interested in the results of the litigation by reason of its contract to purchase several parcels of land including the subject acres and had contracted to expend large sums of money for such lands and in developing a housing project thereon.

The action was duly tried and decision filed substantially adopting the findings of respondents made while sitting as the city council of Inglewood. They found that before a variance may be granted it shall be shown:

"1. That there are exceptional or extraordinary circumstances or conditions applicable to the property involved or to the intended use of the property that do not apply generally to the property or class of uses in the same vicinity or zone.

"2. That such variance is necessary for the preservation and enjoyment of a substantial property right of the applicant

possessed by other property in the same vicinity and zone.

"3. That the granting of such variance will not be materially detrimental to the public welfare or injurious to the property or improvements in such vicinity and zone in which the property is located; and

"4. That the granting of such variance will not adversely affect the Comprehensive General Plan" as required by subparagraph C, part II of section 14, ordinance 925 of Inglewood as amended by ordinance 947.

Also, it was found that (1) the Turf Club is owner of 124 acres lying within the city of Inglewood; (2) its application demanded relief pursuant to subparagraphs 1, 2, 3 and 4 of paragraph C, part III of section 14 of ordinance 925, above quoted; (3) it prayed for a variance from R-1, single-family zone, to R-3, multiple-family zone with respect to a portion of its acres; (4) there are exceptional or extraordinary circumstances or conditions applicable to the property involved or to the intended use of the property that do not apply generally to the property or class of uses in the same vicinity or zone; (5) the subject property is vacant, comprises 20 acres, fronting 1070 feet on Crenshaw Boulevard with a depth of 820 feet, and lies at the top of a downward slope overlooking the easterly portion of the race track installations which consist of a quarter-mile practice track, dormitories and barns for 1,300 horses; (6) in January, 1950, intervener Firks as trustee contracted for the purchase of the 20 acres for the purpose of developing same for multiple residential use, and he and his principal, Hollypark Knolls Inc., are now the owners of such lands; (7) they and their predecessors have expended $17,876 for the preparation of plans for the erection of a garden-type-apartment project consisting of 22 multiple residential units on the lands for the use of the Turf Club, for processing preliminary applications for financing the project and for processing applications before the Federal Housing Administration; (8) on May 2, 1950, respondents adopted resolution 3150 granting a variance from R-1 to R-3 for multiple residential use; (9) upon the adoption of such resolution, Firks and his principal became obligated to complete the purchase of the land at a cost of $187,000, which sum they paid to the Turf Club; (10) since the granting of the variance the Hollypark Knolls, Inc., with knowledge of the pendency of this proceeding has expended for services and materials in the construction of the 22 multiple residential units the sum of $76,853.99 and have become indebted for

architect's fees, lumber, concrete, plumbing, plastering, painting, hardwood flooring, electrical wiring, appliances and other necessary materials and subcontracts in the sum of about $1,320,000 and have a commitment for a loan of $2,550,000 from a responsible bank to finance the 22 units and the Federal Housing Administration has issued its commitment for the required insurance; (11) prior to ordering the variance respondents granted a fair trial and hearing and their findings are supported by substantial evidence; (12) the granting of the variance will not be materially detrimental to the public welfare or injurious to the property or improvements in that vicinity, nor will it adversely affect the comprehensive general plan of zoning the city of Inglewood.

### Sole Issue

On this appeal only one issue is presented, to wit, is there substantial evidence to support the findings of the trial court. ■ That the proof introduced on behalf of appellants might be equally substantial and more voluminous does not affect the rule that this court is powerless to reverse a judgment where it has substantial evidential support. ■ Appellants' stipulation to the truth of practically all the facts comprising the defense alleged in the answer appears in abbreviated form on the margin hereof.* In addition thereto, witnesses testified

---

*Substance of Stipulation.* The subject property is vacant and comprises about 20 acres fronting on Crenshaw Boulevard for 1070 feet with a depth of about 820 feet westerly. It lies overlooking the easterly portion of the Hollywood Park race track installations. The Park includes a grandstand, clubhouse and turf club for the accommodation of 70,000 spectators; parking space for 20,000 automobiles; barns for 1,300 race horses; a quarter-mile practice track lying below the slope which extends westerly from the subject property; dormitory for jockeys and unmarried employees. The barns, practice track and exercise facilities are visible from a portion of the subject 20 acres. At the foot of the slope, below those acres, are producing oil wells and four derricks, a gas absorption plant and within 600 feet of the acres is a pumping oil well with derrick removed.

Flat racing for 50 days each year, and harness racing for 35 days in alternate years are customarily conducted. The Park facilities are used for training horses, truck rodeos, various public spectacles and exhibitions, and for animal and flower shows.

The north line of the subject 20 acres is 1710 feet south of Manchester avenue where it intersects Crenshaw, both popular crosstown arterial traffic highways. For 700 feet south of Manchester (which is 86th street), on both sides of Crenshaw the property is zoned for and is in use for commercial purposes, while Crenshaw on its west side from the southerly boundary of the subject acres south to 90th street is zoned R.3. South of 90th street there is a 90-foot paved roadway from the parking area of the Turf Club and for ingress to and egress from the absorption plant.

On the north and west sides of the subject acres is an L-shaped

that the property is ideally suited for this kind of development; the proposed plan to build multiple homes on the subject area will answer the criticism that Hollywood Park should be used for homes; it will not injure property values on Crenshaw Boulevard; the property across the said boulevard is now used for institutional and multiple dwelling purposes; it is a beautiful setting for "392 units and a multiple dwelling"; it is zoned for R-1 because it is unsubdivided; there is a refinery, the race track and many other things down there; the project will be pretty close to the oil well and those "firetrap·barns"; it will be an improvement to the community; something should be built in the vacant plot; it is unlikely that single-family residences will be built there. Mr. Sweeney, an appraiser, testified that "the best use for this land and the best zoning . . . would be for multiple residents [sic] and one of the worst would be the single family residence." Commissioner Lavers testified the property is suitable for multiple leasing, and he and Commissioners Nixon and Sheddan do not believe the tract is desirable R-1 property, while Commissioner Levelle thought that because the subject land is close to the race track, surrounded by boulevards, near the city and high in value, it is suitable for multiple dwellings. In addition, it was pointed out by Mr. Vernon Spencer that Crenshaw Boulevard is a major traffic artery and near the land are churches, motels and duplexes. Mr. Dean thinks it would be impossible to subdivide the 20 acres for single dwellings from an economic standpoint. Mr. Spydell thinks the land is not suitable for single residence homes with the race track during the activity season. The multiple type units are adaptable to that location.

Besides the detailed testimony of such witnesses, photographs of the Turf Club's property and of that east of Crenshaw Boulevard as well as of the 20 acres were received in

---

area of 20 acres reserved for municipal use of the Water and Park Departments of Inglewood. It includes a strip 190 feet wide lying southerly from the said 90-foot roadway. The reserved area and the roadway together extend 280 feet on Crenshaw south of the south line of 90th street and the northerly line of the subject acres, and is therefore over 300 feet south of the nearest single-family residence on the west side of Crenshaw.

On the east side of Crenshaw opposite the subject acres is an area zoned R-1-½, also there are two motels, several duplexes and a church.

Residents of the area have complained of dust and dirt from the unimproved property.

It has been the practice of Inglewood to classify unsubdivided property as R-1 pending the establishment of the character of the neighborhood.

evidence as were also exhibits depicting the exterior appearance of the proposed development.

### CITY COUNCIL, QUASI JUDICIAL

■ Inasmuch as respondents acting as the city council had the power finally to determine the facts submitted in such a controversy, their decision is final in the absence of a showing of abuse of discretion. (*Rubin* v. *Board of Directors,* 16 Cal.2d 119, 126 [104 P.2d 1041] ; *Dierssen* v. *Civil Service Com.,* 43 Cal.App.2d 53, 60 [110 P.2d 513] ; *Otis* v. *Los Angeles,* 52 Cal.App.2d 605, 613 [126 P.2d 954] ; *Childs* v. *City Planning Com.,* 79 Cal.App.2d 808, 812 [180 P.2d 433] ; *Lindell Co.* v. *Board of Permit Appeals,* 23 Cal.2d 303, 324 [144 P.2d 4].) Section 14 of ordinance 925 authorized such variances by the planning commission and ''the granting of such a variance when conforming to the provisions of this paragraph [I] is hereby declared to be an administrative function the authority and responsibility for performing which is imposed upon the Planning Commission, and the action thereon by the Planning Commission shall be final and conclusive provided the circumstances prevailing in connection with any such variance conform to one or more'' of several conditions specified. However, the type of variance from R-1 to R-3 falls in part II of section 14 wherein the decision of the commission is ''advisory'' only to the city council. Section 16 under ''Hearings'' requires the commission to make its recommendations and findings to the city council by forwarding to the latter a copy of its resolution, and when the council disapproves the action of the commission, its decision shall be final.

On appeal to the council, the instant contest was tried *de novo* with new witnesses as well as the record made before the commission. Resolution No. 3150 is a comprehensive statement of the council's trial, findings and decision granting the variance requested by reason of the fact that ''there are exceptional and extraordinary circumstances or conditions applicable to said subject property'' and that ''the variances applied for are necessary for the enjoyment of a substantial property right of the applicant.'' Pursuant to plaintiffs' motion, the matter was reargued without change in the findings or decision. Thereafter, the matter was transferred to the court below on plaintiffs' petition with the decision already indicated.

### No Abuse of Discretion

■ There was no abuse of discretion. The city council proceeded strictly in accordance with ordinance 925 as amended, its findings support the decision and *substantial* evidence supports the findings.

■ Appellants contend that if the Turf Club did not comply with the requirements prescribed in part II of section 14 of ordinance 925, the trial court abused its discretion. However, the findings and the evidence show that the standards prescribed have been complied with. If perchance the procedure before the council lacked some of the formality observed by judicial tribunals their decision is nonetheless vital and effective. (*Bartholomae Oil Corp.* v. *Seager,* 35 Cal.App.2d 77, 80 [94 P.2d 614] ; *Cantrell* v. *Board of Supervisors,* 87 Cal.App.2d 471, 479 [197 P.2d 218].) There is a total absence of a showing that the court's discretion was abused.

Judgment affirmed.

McComb, J., and Wilson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 9, 1951.